UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD LEE DUVAL and
JEREMY DUVAL,

                Petitioners,

v.

UNITED STATES OF AMERICA,

                Respondent.
_____/

Criminal Case Number: 11-20594
Civil Case Numbers: 15-13492, 15-13494
Honorable David M. Lawson

# OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE AND MOTION TO REDUCE SENTENCE

Following a jury trial, petitioners Gerald Duval and his son Jeremy Duval were convicted of violating the Controlled Substances Act. The convictions were based on the petitioners' operation of a marijuana operation, which was curtailed after two searches of their family farm resulted in the seizure by federal drug task force agents of a total of more than 200 marijuana plants. Gerald Duval was sentenced to concurrent prison terms totaling 120 months. Jeremy was sentenced to 60 months in prison. Supervised release was ordered to follow in both sentences. The convictions were affirmed on appeal. *United States v. Duval*, 742 F.3d 246 (6th Cir. 2014). Each petitioner then filed a motion to vacate their sentences, alleging government misconduct and ineffective assistance of trial counsel. The petitioners also argue that the government should be barred from opposing these motions because of a prohibition contained in an appropriations bill relating to marijuana prosecutions. Because none of these claims justifies the relief they seek, the Court will deny both motions.

I. Facts and Proceedings

The Sixth Circuit included the following comprehensive recitation of the factual and procedural background of the case in its opinion affirming the defendants' convictions:

> In May and June 2011, Monroe County Sheriff's Deputy Ian Glick investigated tips from a confidential informant (CI) that led him to conduct surveillance on Gerald [Duval]'s farm and ultimately to apply for and execute two separate search warrants that are at issue in this case. The government contends that Deputy Glick simply conducted a routine investigation to corroborate information supplied by the CI, but the Duvals argue that as duly registered marijuana patients and caregivers under state law, they were the targets of an investigation for which the conclusion was never in doubt. According to the Duvals, Deputy Glick and other law-enforcement officers knew that the Duvals possessed and grew marijuana because agents from the Office of Monroe Narcotics Investigations (OMNI) visited the farm in 2010 and offered advice on how to comply with the MMMA.
>
> Deputy Glick was assigned to OMNI, an alliance of state and local law-enforcement officers directed by the Drug Enforcement Agency (DEA), from 2004 to 2007, but was a Task Force Officer working directly with the DEA when his office received a tip that Gerald was growing marijuana on his farm. The tip came from a CI who claimed to have seen marijuana growing in two greenhouses on the farm and to have heard Gerald bragging about growing and selling marijuana. Moreover, the CI claimed that the greenhouses were surrounded by tall chain-link fences and patrolled by Rottweilers.
>
> Deputy Glick took immediate action to substantiate the CI's tip. He consulted the Law Enforcement Information Network (LEIN) and learned that Gerald had a federal felony conviction for cocaine trafficking. This prior conviction prohibited Gerald from qualifying as a caregiver under Michigan law, Mich. Comp. Laws § 333.26423(g) (2008), a status that Gerald never claimed. Deputy Glick then decided to conduct surveillance on the farm.
>
> Along with Reserve Deputy Joe Schumaker, Deputy Glick traveled to a tract of land adjacent to the farm. From that vantage point, the officers saw two greenhouses matching the CI's description. Eight-foot-high chain-link fences topped with barbed-wire surrounded the greenhouses. The greenhouses themselves were constructed from opaque plastic slats and were almost completely bordered by a three-foot-tall layer of burlap that ran along the perimeters of the buildings. Open ventilation windows located slightly above the layer of burlap material provided a view into the interiors of the greenhouses.
>
> Using binoculars to peer through the ventilation windows from a distance of approximately 75 to 100 yards, Deputy Glick and Reserve Deputy Schumaker

observed a "large quantity" of marijuana plants. In addition, Reserve Deputy Schumaker testified that open doors on the southern sides of the greenhouses provided an unobstructed view of the marijuana. Deputy Glick subsequently prepared a search-warrant affidavit based on the CI's now-corroborated tip and his own personal observations. A Monroe County magistrate issued a search warrant on June 15, 2011.

Deputy Glick's affidavit in support of the June 15 search warrant included a description of the greenhouses. The two opaque structures, surrounded by barbed-wire fences, were allegedly constructed after OMNI officers told the Duvals in September 2010 that secure facilities were needed to comply with the MMMA. Although the Duvals claim that Deputy Glick provided this advice, other officers testified that Deputy Glick was neither a member of OMNI in September 2010 nor on duty on the date of the visit. Deputy Glick himself denied being present.

Regardless of whatever prior encounters occurred between OMNI and the Duvals, law-enforcement officers searched the farm on June 16, 2011. In particular, the officers searched a two-story house, the two greenhouses, and a large pole barn, seizing 144 live marijuana plants, seven firearms, and various other items related to marijuana cultivation. No criminal charges, however, were brought against the Duvals under state or federal law at that time.

But the June 16 search did not end the investigation. On July 18, 2011, the CI again contacted Deputy Glick and reported that the Duvals had replanted marijuana in the greenhouses. Agent Brendan Gillen and Task Force Agent Jeremy Langenderfer subsequently traveled to the same tract of land adjacent to the farm and saw marijuana "growing the length of both greenhouses." After verifying the information, Deputy Glick obtained another warrant to search the farm — only this time he sought the warrant in federal court based on probable cause for federal narcotics violations. Law-enforcement officers executed this second search warrant on August 9, 2011, seizing 67 live marijuana plants from the two greenhouses.

In November 2011, the Duvals jointly requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), for the purpose of suppressing the evidence gathered during the June 16 and August 9 searches. The district court held a hearing on the Duvals' motion to suppress in January 2012, ordering the parties to file supplemental briefing and provide additional photographic evidence related to the searches.

A second evidentiary hearing was held in March 2012. The district court denied the motion to suppress at the conclusion of the second evidentiary hearing.

After a nine-day trial in April 2012, the jury found the Duvals guilty on the drug-related counts in the indictment, but not guilty on the counts related to the firearms.

> On October 1, 2012, the district court sentenced the Duvals, who shortly thereafter
> filed timely notices of appeal.

*Duval*, 742 F.3d at 249-50. On appeal, the Sixth Circuit rejected on the merits the defendants' arguments that (1) "the June 15, 2011 search warrant [was] invalid because Deputy Glick made deliberate 'material omissions' concerning the Duvals' status as registered patients and caregivers under Michigan law in order to obtain the warrant," 742 F.3d at 250; and (2) "the June 15 search warrant [was] invalid because Deputy Glick applied to a state magistrate rather than to a federal magistrate judge, allegedly in violation of Rule 41(b) of the Federal Rules of Criminal Procedure," *id.* at 254. The panel also held that the defendants had forfeited their argument that the indictment was "defective as a matter of law because Jeremy and Ashley cultivated the marijuana plants while serving as registered 'caregivers' under Michigan law and because Jeremy qualifie[d] under the 'practitioner exception' of the Controlled Substances Act, 21 U.S.C. § 802(21)." *Id.* at 255.

The defendants timely filed their 2255 motions. The government has responded to those motions and the defendants filed replies. The defendants also filed supplemental briefs raising an argument not addressed in their opening motion briefs — that the government's opposition to the present motions is barred by a 2014 funding bill rider that prohibited the Department of Justice from expending funds to interfere with the administration of medical marijuana regulations enacted by various states including Michigan.

## II. Discussion

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. §

2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998). However, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). Claims of ineffective assistance of counsel are properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

The petitioners raise four common issues with identical arguments in support, which are: (1) their due process rights were violated by the government's knowing presentation of perjured testimony by Deputy Ian Glick when he stated that he never visited the defendants' farm in September 2010 and advised them on complying with the Michigan Medical Marijuana Act; (2) the petitioners' trial counsel were ineffective by failing to argue that the affidavit by Deputy Glick in support of the search warrant for the petitioners' farm was invalid because (a) Glick omitted from the affidavit his knowledge that Ashley and Jeremy Duval were authorized to grow marijuana under state law, and (b) "there was no showing that a federal magistrate was not 'reasonably available'" when Glick sought the warrant from a state court magistrate; (3) their counsel were ineffective by failing to move to dismiss the indictment and failing to argue at trial the affirmative defense that the cultivation of marijuana by Ashley and Jeremy Duval fell within the "practitioner

exception" to the Controlled Substances Act, 21 U.S.C. § 802(21); and, in a supplemental brief (4) the government is barred from opposing their motions by the prohibition on use of funds appropriated to the Department of Justice to "interfere" with the implementation of state laws regulating the medical use of marijuana.

Gerald Duval raised one additional claim that his trial counsel was ineffective by failing to arrange a post-conviction debrief with the government that, he contends, would have entitled him to safety-valve relief from the mandatory minimum term in prison that the Court imposed. Each claim will be addressed in turn.

A. Perjured Testimony

The petitioners' claim that Deputy Glick lied about never visiting the petitioner's farm in 2010 focuses on their defense of entrapment by estoppel. Glick was cross-examined extensively on this point at trial and denied that he had visited the farm on the earlier occasion.

"The 'deliberate deception of court and jury by the presentation of testimony known to be perjured' violates a defendant's due-process rights." *Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). "To prevail on such a claim, [the petitioner] must show that the Government knowingly presented false testimony that materially affected the proceeding." *Ibid.* However, a showing of "'mere inconsistencies' in the testimony will not suffice." *Ibid.* Instead, the petitioner "must prove that the Government's testimony was 'indisputably false.'" *Ibid.* (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). "[O]rdinarily, claims of perjury must also overcome a harmless-error analysis," but "reaching that issue is often unnecessary because of the difficulty in proving that the

Government's witness 'testified in an indisputably false manner.'" *Ibid.* (quoting *Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009)).

The petitioner's claim fails for several reasons. *First*, the petitioners have not offered any information in support of their motions to support the claim, and in their replies they frankly admit that they "do not possess the ability to show the falsity of Glick's testimony because, as noted in the Motion[s] to Vacate, [they] have not received any records related to law enforcement's investigation of the Ida Center property in September of 2010, despite a number of different Freedom of Information Act requests directed at state and federal law enforcement agencies." Reply Brief, ECF No. 130, PageID.3822-23. Moreover, the issue of Glick's credibility was litigated extensively, and he was subjected to repeated cross-examination by defense counsel during a multi-part evidentiary hearing and at trial. And the petitioners have not pointed to any new information that they have uncovered in the course of the seven years since their trial that reasonably could be construed as showing that Glick's testimony was "indisputably false." In fact, they admit that they have no new information at all to offer.

The petitioners insist that they should be permitted to conduct discovery on the question of what agency employed Glick in September 2010, but they have not offered any specific facts to justify an expectation that any new evidence on that topic would be forthcoming. "Courts have the discretion to grant discovery in collateral challenges upon a showing of 'good cause' under Rule 6 of the Rules Governing 28 U.S.C. § 2255 cases." *Poulsen v. United States*, 717 F. App'x 509, 517-18 (6th Cir. 2017) (citing *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997); *Cornell v. United States*, 472 F. App'x 352, 354 (6th Cir. 2012)). "'Good cause is established where *specific allegations* show reason to believe that the movant may, if the facts are fully developed, be able to

demonstrate entitlement to relief.'" *Ibid.* (quoting *Cornell*, 472 F. App'x at 354) (emphasis added). Again, they admit in their briefing that they have nothing new to offer on this point that was not already presented at trial and in the pretrial hearings.

*Second*, even if some further doubt may be raised about Glick's credibility, the petitioners have not pointed to anything in the record even suggesting that the prosecutor knowingly offered false testimony. Theron Duval attested that "[d]uring the trial, [he] was walking outside the courtroom and [] saw the prosecutor talking to Deputy Glick," and "[t]he prosecutor said to Deputy Glick, 'you need to get your stories straight because there are a lot of inconsistencies in [your] stories.' The prosecutor then told him, 'I don't want to lose the case because of your inconsistencies.'" Theron Duval decl. ¶ 4, ECF No. 121-5, PageID.3749. It is well settled that mere "inconsistencies" in witness testimony are not sufficient to establish that a witness's statements under oath were "indisputably false." *Monea*, 914 F.3d at 421 ("[The defendant] suggests that the mere possibility of an inconsistency in [the witness's] testimony shifts the burden to the Government to prove that his statements were true. But that has the law exactly backwards. Not only are 'mere inconsistencies' not enough to sustain a claim of perjury, but [the petitioner] bears the burden on this issue. The Government has no obligation to prove the truth of its own testimony if [the defendant] cannot first make the case that it was 'indisputably false.'"). And nothing in the prosecutor's comments referred to Glick's representations about his employment or indicated in any way that the prosecutor knew that any such statements were false.

*Third*, any defect in the proceedings as a result of "false" testimony by Glick about his employment status was harmless in light of the testimony by other witnesses that, regardless of his affiliation, Glick was not present at the Duval farm in September 2010. The petitioners do not

even attempt to attack any of the testimony by those other witnesses, let alone to demonstrate that anything they said was "indisputably false." And the petitioners were not prevented from presenting their entrapment-by-estoppel defense to the jury, because they were able to argue based on their own testimony that they were advised by law enforcement officers in 2010 about how to comply with the Michigan Medical Marijuana Act, regardless of which state officers they believed gave the advice.

The petitioners' position also entirely disregards the fact that a second search warrant execution in August 2011, based on entirely new observations of replanted marijuana on the property, resulted in the seizure of more than 67 marijuana plants, in addition to the 144 plants seized during the June 2011 search. In light of that overwhelming and essentially unchallenged *prima facie* evidence of their guilt, there is no substantial likelihood that Glick's testimony about the peripheral issue of his employment status affected the outcome of the trial. *United States v. Reynolds*, 534 F. App'x 347, 365 (6th Cir. 2013) ("In light of this overwhelming evidence of [the defendant's] guilt, it is unlikely that Agent Lewis's improper testimony affected the defendant's substantial rights or seriously affected the fairness, integrity, or public reputation of the proceedings."). Thus, any error in the presentation of Glick's testimony was harmless.

## B. Ineffective Assistance of Counsel

To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

Both petitioners contend that their respective trial attorneys failed them by not arguing about Glick's material omissions in the search warrant affidavit, allowing Glick's choice of seeking the first search warrant from a state magistrate to go unchallenged, not moving to dismiss

the indictment under the "practitioner exception" to the Controlled Substances Act, and not asserting an affirmative defense on that same ground.

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing defective performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute defective performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (reiterating that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### 1. Search Warrant

The petitioners argue that their trial counsel was ineffective by failing to raise a "material omissions" challenge to the June 2011 warrant affidavit and by failing to argue that the warrant was improperly obtained under Federal Rule of Criminal Procedure 41(b). Contrary to the petitioners' arguments in their motions, the Sixth Circuit found that the material omissions

argument was, in fact, advanced by the Duvals' trial counsel; thus, counsel's performance could not have been deficient where the argument they urge actually was made. Moreover, the court of appeals rejected the defendants' positions on both issues on the merits, and counsel cannot be deemed ineffective for failing to raise meritless positions. *Duval*, 742 F.3d at 250, 254.

"A § 2255 motion may not be used to re-litigate an issue that was raised on appeal absent highly exceptional circumstances." *Dupont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). In their present motion the defendants' attempt to resuscitate their arguments by relying on the same missing proof of Glick's employment status, which they contend would have fatally undermined the government's position at the suppression hearing. But, as noted above, they admit that to date they have not actually uncovered any new information suggesting that Glick knew anything that he omitted from the warrant applications. No exceptional circumstances exist here.

2. Practitioner Exception

The petitioners also argue that their trial counsel performed deficiently by not raising at trial an affirmative defense to the charges based on the "practitioner exception" to the Controlled Substances Act under 21 U.S.C. § 802(21). But the facts did not support such a defense. Defense counsel cannot be faulted for not filing a meritless motion or raising an unjustified defense. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (reiterating that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

"The Controlled Substances Act prohibits a person from dispensing or distributing a controlled substance." *United States v. MacKay*, 715 F.3d 807, 814 (10th Cir. 2013). "But a physician is exempt from this prohibition as long as he is registered and acting as authorized." *Ibid.* (citing 21 U.S.C. §§ 802(21), 822(b)). As the Fourth Circuit has explained, the so-called "physician exception" requires that a person holds both a license from a state or federal authority *and* a valid DEA registration to dispense a controlled substance:

> Section 841(a)(1) provides that, "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute, or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1). To dispense is "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance." 21 U.S.C. § 802(10) (2012). A practitioner is "a physician . . . or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which [s]he practices . . . to distribute, [or] dispense . . . a controlled substance in the course of professional practice." 21 U.S.C. § 802(21) (2012). Under this definition, Cheek did not qualify as a practitioner at the time of the charged offenses, and therefore her conduct in issuing controlled substances is not protected by this statutory exception. *See United States v. Blanton*, 730 F.2d 1425, 1429-30 (11th Cir. 1984) (holding that individuals who lack a valid DEA registration are not authorized to dispense controlled substances).

*United States v. Cheek*, 592 F. App'x 179, 181-82 (4th Cir. 2014).

Gerald Duval never argued that he was validly authorized to grow or distribute marijuana under state law, and he did not dispute that he was prevented from becoming so authorized by his prior felony conviction. Jeremy Duval insisted that he was registered as a "caregiver" under the state law, but no evidence ever has been offered (presumably because there is none) that either of the Duvals ever applied for or held a valid DEA registration that authorized them to dispense marijuana. Therefore, any "defense" under the practitioner exception would have been frivolous, and trial counsel cannot be faulted as ineffective for failing to raise a defense that had no basis in either law or fact. *United States v. Goldston*, 906 F.3d 390, 395 n.1 (6th Cir. 2018) ("[A]

practitioner purporting to engage in administering or dispensing a controlled substance *but doing so in violation of law* is not excluded from the federal definition of 'distributing.'"); *United States v. Schneider*, 704 F.3d 1287, 1298 (10th Cir. 2013) ("To be exempted from § 841(a)(1)'s prohibitions, the physician *must be registered and acting as authorized*."); *United States v. Vamos*, 797 F.2d 1146, 1151 (2d Cir. 1986) ("In order to enable physicians and certain others (e.g., manufacturers) lawfully to distribute or dispense drugs within the course of their professional practice Congress provided that '*Persons registered . . . under [the CSA] . . . are authorized [to dispense controlled substances] . . . to the extent authorized by their registration* and in conformity with the other provisions of this subchapter.' *Such registration is mandatory if the registrant is authorized to dispense drugs under the law of the state where he or she practices*." quoting 21 U.S.C. § 822(b)); *United States v. Blanton*, 730 F.2d 1425, 1429 (11th Cir. 1984) ("[U]nder the plain language of the statute, *a person who is not registered by the Attorney General for a given substance is not authorized to dispense it* and thus is not excepted from prosecution under section 841.") (emphases added).

The petitioners mount an expansive argument based on *Gonzales v. Oregon*, 546 U.S. 243 (2006), which they contend "altered the landscape" of federal and state drug regulations. But the Sixth Circuit has held that *Gonzales* changed nothing about the application of the practitioner exception in the context of a federal criminal prosecution under the Controlled Substances Act. It certainly did not "alter the reality that knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances." *United States v. Volkman*, 797 F.3d 377, 386 (6th Cir. 2015) (quotations omitted); *id.* at 385 ("*Gonzales* dealt only with the question of the Attorney General's

ability to define 'legitimate medical purpose' in light of state medical standards to the contrary [and] was decided in the setting of administrative law, not criminal law."). Nothing in *Gonzales* suggests that the practitioner exception could have applied here.

### C. Appropriations Rider

In a supplemental brief, the petitioners contend that the government is barred from opposing their motions by the prohibition on use of funds appropriated to the Department of Justice to "interfere" with the implementation of state laws regulating the medical use of marijuana.

> In 2014, Congress included the following rider in an omnibus appropriations bill: None of the funds made available in this Act to the Department of Justice may be used, with respect to the States of . . . Michigan . . . [and 31 other states and the District of Columbia] to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217. Congress enacted an essentially identical rider in the appropriations acts for the following two fiscal years. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332-33 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 537, 131 Stat. 135, 228 (2016).

The petitioners' request for an injunction to bar the government from resisting their motions is not entirely novel. Several defendants across the country, primarily in the Ninth and Sixth circuits, have attempted to parlay the congressional appropriations prohibitions into prosecution bars when the conduct might be lawful under a state's medical marijuana laws. And in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), the Ninth Circuit addressed "whether criminal defendants may avoid prosecution for various federal marijuana offenses on the basis of [the riders] that prohibit[ ] the United States Department of Justice from spending funds to prevent

states' implementation of their own medical marijuana laws." *Id.* at 1168. That court held that injunctions might be appropriate in certain cases, if not to enjoin the marijuana law prosecutions themselves, then at least "to enjoin the DOJ from *spending funds* from the relevant appropriations acts on such prosecutions." *Id.* at 1172.

But nothing in the December 2014 and following appropriation acts has any impact on these 2012 prosecutions and convictions, which were completed *more than two years before* any marijuana-related restrictions were imposed by Congress on the DOJ. Certainly nothing in the appropriations riders supplies any support for a conclusion that the convictions were unsound or that relief is warranted now under section 2255; no federal court ever has held that the rider provides any species of affirmative defense to a charge under the Controlled Substances Act. *McIntosh*, 833 F.3d at 1179 n.5 ("To be clear, [the appropriations rider] does not provide immunity from prosecution for federal marijuana offenses. The CSA prohibits the manufacture, distribution, and possession of marijuana. Anyone in any state who possesses, distributes, or manufactures marijuana for medical or recreational purposes (or attempts or conspires to do so) is committing a federal crime. . . . Nor does any state law 'legalize' possession, distribution, or manufacture of marijuana. Under the Supremacy Clause of the Constitution, state laws cannot permit what federal law prohibits. U.S. Const. art VI, cl. 2. Thus, while the CSA remains in effect, states cannot actually authorize the manufacture, distribution, or possession of marijuana. Such activity remains prohibited by federal law.").

Moreover, the petitioners have not cited any authority for the remarkable proposition that the government is foreclosed from opposing a motion to vacate a conviction and sentence by a subsequent enactment that does not even suggest that the prosecution or conviction was

unauthorized when it was completed, years before that enactment. And the petitioners' present incarceration by the Bureau of Prisons is not implicated by the funding rider, because there is no suggestion that any funds appropriated to the Department of Justice are involved there. *Sandusky v. United States*, No. 12-548, 2015 WL 12724077, at *6 (C.D. Cal. Nov. 2, 2015) ("Nothing about Petitioner's [appropriations rider] challenge implicates the Court's jurisdiction to impose the sentence or plausibly supports an inference that the sentence was imposed in violation of the Constitution or laws of the United States, or exceeded the maximum authorized by law. . . . Petitioner's continued incarceration simply does not violate [the appropriations act] because it is not an expenditure of funds by the Department of Justice that prevents California from implementing laws authorizing the use, distribution, possession, or cultivation of medical marijuana. Petitioner's [funding rider] claim therefore fails on the merits.").

As this Court and others have observed, the rider permits a defendant, at most, to seek limited relief in the form of a *pretrial* evidentiary hearing to determine whether the defendants were in "strict compliance" with all aspects of the applicable state laws, and, if so, whether an injunction against continuation of a pending prosecution should be granted. *United States v. Bally*, No. 17-20135, 2017 WL 5625896, at *5 (E.D. Mich. Nov. 22, 2017) ("[The defendant] argues that, under *McIntosh*, he is entitled to an evidentiary hearing to present *prima facie* evidence of each element of his [state law] defense. He also believes that upon showing such *prima facie* evidence, he is entitled to present an affirmative defense to the charges to the factfinder. That is incorrect. The sole purpose of the evidentiary hearing to which the *McIntosh* court referred is for the court to decide whether the DOJ is violating the appropriations rider, thus providing a basis for

enjoining the spending of funds. *The hearing is not a forum for the defendant to present an affirmative defense to the federal charges brought against him.*" (emphasis added)).

Even if they had sought such a hearing, these petitioners certainly could not have prevailed under enactments that did not even exist in 2012. Moreover, given the vast quantities of marijuana plants seized from their farm, there is no plausible possibility that the petitioners could have demonstrated that they ever were in "strict compliance" with Michigan's MMA; and Gerald Duval admittedly was not because he never maintained that he was authorized as a grower under state law. *See United States v. Campbell*, 754 F. App'x 563, 563 (9th Cir. 2019) ("Because Campbell concedes that he did not own the Hidden Valley House at the time, and that he failed to provide a landlord permission form along with his 2016 application, the district court was correct in determining that Campbell was not in strict compliance with all state law conditions regarding the cultivation of marijuana.").

No appropriations rider prevents the government from opposing the petitioners' motions.

### D. Safety Valve

Gerald Duval criticizes his trial attorney for not arranging a proffer session following his conviction so that he could debrief in an effort to avail himself of the "safety valve," *see* 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2, and thereby avoid a mandatory minimum sentence. *See United States v. Felix*, 711 F. App'x 259, 262 (6th Cir. 2017).

"There are five conditions that must be met before a defendant is eligible for a safety-valve reduction." *Ibid.* (citing 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2). Pertinent here is the fifth condition, which requires that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning

-17-

the offense or offenses that were part of the same course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(5). "'The defendant bears the burden of showing eligibility for the safety valve by a preponderance of the evidence.'" *Ibid.* (quoting *United States v. Stewart*, 306 F.3d 295, 327 n.19 (6th Cir. 2002)).

Gerald Duval contends that such briefing would have resulted in a full and truthful allocution that would have entitled him to safety-valve relief as his sentencing. But even if he could show deficient performance stemming from his lawyer's disregard of instructions to arrange a meeting with the government, he cannot show prejudice. Gerald offers nothing to support the empty assertion that he would have given a "truthful and complete account" of his participation in the growing operation. And nothing in the record suggests that he would have offered anything beyond his trial testimony, in which he denied any involvement. That testimony, of course, indisputably was *not* complete or truthful, since it is plain that the jury found him guilty.

In his motion, Gerald Duval asserted, without elaboration, only that if he "had been given the opportunity to satisfy the final requirement of § 3553(f), he would have offered the Government all of the information and evidence he had concerning the charged offenses." His sketchy affidavit attached to the motion posits little more, where he merely stated that he had "read the facts supporting my Motion to Vacate and Set Aside [his] Sentence under 28 U.S.C. 2255 and can attest to the truth and accuracy of those facts." Gerald Duval decl. ¶ 2, ECF No. 121-4, PageID.3747. Those vacant assertions are nowhere near the sort of comprehensive account of a compelling allocution that a defendant must advance to support his claim that he likely would have received relief under the safety-valve provision if he had been permitted to confess. As the Tenth Circuit

has explained, a district court cannot find prejudice from a debriefing denied absent a compelling and specific recitation of what information would have been offered:

> [E]ven if Mr. Herrera-Zamora had been able to demonstrate a reasonable probability that he would have cooperated, we conclude that he still would not be entitled to a [certificate of appealability on the question whether his trial lawyer was ineffective]. This is because he failed to give the district court enough information for it to conclude, as *Strickland* requires, that there was a reasonable probability that, but for his counsel's purported ineffectiveness, the result of the proceeding would have been different — *viz.*, he failed to make a showing that there is a reasonable probability that the sentencing court would have found his disclosure truthful and complete and, in turn, would have granted safety-valve relief. Mr. Herrera–Zamora never told the district court in the instant case what information he would have disclosed to the government to qualify for safety-valve relief. As a result, he left the district court powerless to conclude that there was a reasonable probability that the sentencing court would have granted such relief.

*United States v. Herrera-Zamora*, 647 F. App'x 855, 859-60 (10th Cir. 2016) (quotations and citations omitted). Moreover, a debrief would have secured nothing more for the petitioner in any event beyond *consideration* for safety-valve relief; certainly, in the absence of any information about what the petitioner would have said, there is no basis for a finding that the Court likely would have *granted* that relief. *United States v. Landsaw*, 206 F. App'x 773, 776-77 (10th Cir. 2006) ("[S]afety valve consideration is just that — consideration. Even if [the defendant] had been given the opportunity to proffer information to the government for safety valve analysis, it is possible that he would not have been awarded safety valve relief under 18 U.S.C. § 3553(f). The government and the sentencing court may not have believed that he had provided a full and truthful account of his knowledge concerning the offense.").

III. Conclusion

Neither Gerald nor Jeremy Duval has shown that they are entitled to relief from their convictions or their sentences.

Accordingly, it is **ORDERED** that the petitioner's motions to vacate their sentences (ECF No. 121, 122) are **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Date: March 30, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on April 1, 2019.

s/Susan K. Pinkowski  
SUSAN K. PINKOWSKI

---